UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| THOMAS BEARD,<br>        *Plaintiff,*<br>        *v.*<br>TOWN OF MONROE, PLANNING AND ZONING<br>COMMISSION OF THE TOWN OF MONROE, and<br>JOSEPH CHAPMAN<br>        *Defendants.* | Civil No. 3:13cv1714 (JBA)<br><br>December 4, 2015 |

**RULING GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

This is an action by Plaintiff Thomas Beard against Defendants Town of Monroe ("the Town" or "Monroe"), Planning and Zoning Commission of the Town of Monroe ("the Commission"), and Joseph Chapman, the Zoning Enforcement Officer ("ZEO") for the Planning and Zoning Commission, alleging violations of Mr. Beard's Fourteenth Amendment right to equal protection under the law.[1] Defendants now move [Doc. # 49] for summary judgment. Oral argument was held on November 30, 2015. For the following reasons, Defendants' motion is granted.

## I.    Background

In 2003, Plaintiff acquired, from his father, property located at 462 Fan Hill Road in Monroe, Connecticut ("the Property") in a Residential and Farming District D Zone ("RD Zone").  (Defs.' Mem. Supp. [Doc. # 49-1] at 1, 2.)

---

[1] The Court previously dismissed [Doc. # 36] Count Two of Plaintiff's complaint, alleging violations of the Connecticut constitution.

## A.  RD Zone Regulations

Under Monroe's Zoning Regulations, "land, buildings, and other structures located in RD Zones were limited to, among other things, (1) a single detached dwelling for one family, (2) farms, nurseries, and greenhouses, (3) roadside farm stand[s] exclusively for the sale of farm produce grown on the premises, (4) customary homes occupations, and (5) municipally owned communications sites and facilities operated or managed by the Town of Monroe." (*Id.* at 2; *see also* Monroe Zoning Regulations, Ex. 2 to Defs.' Mem. Supp.) Further, "[p]roperties located in RD Zones could have no more than one commercial or combination registered vehicle bearing commercial advertising parked or stored on the premises," and "[a]ny commercial or combination registered vehicle showing commercial advertising had to be garaged or screened." (Defs.' Mem. Supp. at 2.) "In addition, no commercial or combination registered vehicle" stored on the property "could exceed one ton" in capacity, and "truck-tractors, commercial semi-trailers, or commercial trailers" could not be parked or stored on RD Zone properties. (*Id.*)

## B.  Plaintiff's Uses of the Property

Plaintiff owned several businesses that were based on the Property: an excavation business, a trucking and hauling business, a salvage business, a loam[2] business, a demolition business, and a snow plowing business. (*Id.*; *see* Beard Test., Ex. 5 to Defs.'

---

[2] "Loam" is made by combining compost, leaves, manure, and topsoil. (Defs.' Mem. Supp. at 2; *see* Beard Test. at 6, 8.)

Mem. Supp. at 6, 13, 14.[3]) Plaintiff stored the following equipment on the Property: three hydraulic excavators, three plow trucks, four trailers, a truck tractor, a dump truck, a bulldozer, a bucket loader, a John Deere tractor, three backhoes, a loader backhoe, a Bobcat, and a site truck. (Defs.' Mem. Supp. at 3; *see* Beard Test. at 16, 21–23.) Of these, the plow trucks, trailers, truck tractor, dump truck, bulldozer, bucket loader, and backhoes were over one ton in capacity, and the plow trucks, trailers, tractor, and dump truck had commercial license plates. (Defs.' Mem. Supp. at 3; *see* Beard Test. at 21–23, 29.)

On March 1, 2007, in response to a question about whether Mr. Beard was operating an illegal earth-moving operation on his property, then-ZEO John "Jack" Brandt reported to the Commission that after investigating the matter, he had concluded that Mr. Beard's use of the land was a prior nonconforming use. (Comm'n Minutes Mar. 1, 2007, Ex. A to Pl.'s Opp'n Mot. for Summ. J. [Doc. # 53] at 1–2.) An undated memorandum apparently written by Mr. Brandt states that he "did not visit" Mr. Beard's property but did meet with Mr. Beard, who explained to him "that a business has been operating from the property since 1963," and on that basis, Mr. Brandt concluded that the business had been "there forever" and was "not illegal." (Brandt Mem., Ex. B to Pl.'s Opp'n.)

In March 2010, Mr. Beard's neighbors, Michael and Teresa Bauer, spoke with Mr. Brandt about his determination that Mr. Beard's use of his property was not illegal and

---

[3] All deposition page numbers refer to the numbering on the deposition, not to ECF's page numbers.

asked him to reconsider. (Ex. 30 to Reply [Doc. # 59] at 2.) The record does not contain Mr. Brandt's response.

### C.  The State Court Lawsuit

On June 1, 2010, the Bauers filed a lawsuit against Mr. Beard in Connecticut state court, alleging that Mr. Beard's activities on his property violated the Zoning Regulations and created a private nuisance. (Defs.' Mem. Supp. at 3; *see* Bauer Compl., Ex. 7 to Defs.' Mem. Supp.)  The state court issued a temporary injunction against Mr. Beard on April 15, 2011, ordering him to:

> immediately cease and desist . . . from operating any commercial business on his property in violation of the Zoning Regulations of the Town of Monroe, including but not limited to (1) the acquisition, or production for sale or delivery, of loam or topsoil, including any of their components, (2) an excavation business and any subcontracting business related thereto; (3) a snowplowing business; (4) a trucking and hauling business; (5) a scrap metal salvage business; and (6) a demolition business.

(Defs.' Mem. Supp. at 4; Temp. Inj., Ex. 4 to Defs.' Mem. Supp. at 9.) The court additionally enjoined Mr. Beard from "parking or storing on his property any commercial vehicle that exceeds one ton capacity in violation of the Zoning Regulations of the Town of Monroe." (Defs.' Mem. Supp. at 4; Temp. Inj. at 9.)

Following the state court ruling, on May 10, 2011, the new Monroe ZEO, Joseph Chapman, issued Mr. Beard a cease and desist letter, in which he notified Mr. Beard that the Town of Monroe expected him to immediately comply "with the decision of the Superior Court . . . by the Honorable Theodore Tyma." (Cease & Desist Ltr., Ex. 8 to Defs.' Mem. Supp.) Mr. Beard appealed the cease and desist letter to the Zoning Board of Appeals ("ZBA") on May 26, 2011. (Defs.'s Mem. Supp. at 5; *see* ZBA Appeal, Ex. 10 to

4

Defs.' Mem. Supp.) The ZBA denied his appeal on July 5, 2011. (Defs.'s Mem. Supp. at 5; *see* ZBA Decision, Ex. 11 to Defs.' Mem. Supp.)

On June 30, 2011, the Town of Monroe and ZEO Chapman moved to intervene in the Bauers' lawsuit "so that they [could] also seek enforcement of the same Zoning Regulations" the Bauers sought to enforce "against the same Defendant[]." (Mot. to Intervene, Ex. 12 to Defs.' Mem. Supp.) The court granted their motion on July 14, 2011. (Ex. 13 to Defs.' Mem. Supp.) Shortly thereafter, on July 21, 2011, Mr. Beard initiated a suit in state court appealing the ZBA's denial of his appeal (Ex. 15 to Defs.' Mem. Supp.), which was consolidated with the Bauer/Monroe/Chapman suit (*see* Stip. of Uncontested Facts, Ex. 16 to Defs.' Mem. Supp. ¶ 18). On April 18, 2012, the court issued judgment and a permanent injunction against Mr. Beard, prohibiting him from "operating any excavation business" on his property; "operating any hauling business" on his property; "operating any snowplowing business" on his property; "parking or storing on the Property" more than one commercially registered vehicle; "operating any scrap metal salvage business" on his property; "operating any demolition business" on his property; "selling, or otherwise providing or delivering, to third parties loam or top soil" from his property; and "handling hazardous material or conducting a mining or quarrying operation on the Property." (State Ct. Judgment, Ex. 17 to Defs.' Mem. Supp.)

### D.  The Other Properties

On May 21, 2012, Plaintiff wrote to Mr. Chapman, "informing" him "of zoning violations" on three properties in Monroe "and requesting that enforcement action be taken." (Beard Compl. Ltr., Ex. 26 to Defs.' Mem. Supp.) Specifically, Mr. Beard sought action against: Westview Farm, the Twombly Property, and the Smith Property.

### 1.   Westview Farm (23 Westview Drive)

Westview Farm, owned by Bernard Sippin, is located in a Residential and Farming District C ("RC") Zone. (Defs.' Mem. Supp. at 6.) Mr. Sippin sells beef from Westview Farm and he keeps llamas and alpacas there. (Sippin Dep., Ex. 20 to Defs.'s Mem. Supp. at 7.) He used to make hay and grow Christmas trees. (*Id.*) In addition, Mr. Sippin sells loam from a second, commercial property on Main Street. (*Id.* at 7–8, 31.) He put up several signs advertising the loam, including one at Westview Farm and one on Main Street. (*Id.* at 46.) Following Mr. Beard's complaint letter, Mr. Chapman asked Mr. Sippin to remove one of the two signs. (*Id.* at 46–49; Chapman Dep., Ex. 9 to Defs.' Mem. Supp. at 50.) There is some dispute as to which sign Mr. Chapman asked Mr. Sippin to take down and whether Mr. Sippin in fact removed the sign after Mr. Chapman asked him to do so. (*See* Sippin Dep. at 46–48; Chapman Dep. at 50.) It is not disputed, however that Mr. Sippin never produced loam, or operated an excavation business, hauling business, scrap metal salvage business, demolition business, or snowplowing business at 23 Westview Drive. (Sippin Dep. at 71–72.)

### 2.   The Twombly Property (146 Cutlers Farm Road)

The Twombly Property, owned by Kenneth Twombly, is located in an RC Zone. (Defs.' Mem. Supp. at 7.) Mr. Twombly uses his farm to grow trees, and he has additionally obtained a license from the state of Connecticut to compost[4] and make mulch. (Twombly Dep., Ex. 22 to Defs.' Mem. Supp. at 8.) His permit allows him to sell 1500 yards of compost each year, and in addition, he uses about 1000 yards of compost

---

[4] Mr. Twombly clarified that compost is different from loam which he defined as topsoil. (Twombly Dep. at 9.)

on his property each year. (*Id.* at 15, 19, 39.) Mr. Twombly has never operated an excavation business, trucking or hauling business, snowplowing business, scrap metal salvage business, or demolition business on his property. (*Id.* at 59.) He maintains the following equipment on his property: an excavator, a John Deere bucket loader, a screener, and a site truck. (*Id.* at 37, 39, 40, 50.)

Mr. Twombly testified that no neighbor has ever complained about his activities on his property. (*Id.* at 25.) There is a dispute about whether, following Mr. Beard's filing of his complaint letter, Mr. Chapman asked Mr. Twombly to remove a sign from his property that advertised the sale of topsoil. Mr. Chapman testified that he asked Mr. Twombly to remove the sign and to stop selling topsoil, and Mr. Twombly agreed to take both actions. (Chapman Dep. at 52.) Mr. Twombly, however, denied ever having spoken to Mr. Chapman about the sign, the topsoil, or any other matter. (Twombly Dep. at 25.)

### 3. The Smith Property (131 Old Zoar Road)

The Smith Property, located in an RD Zone, is owned by Blakeman "Sandy" Smith. (Defs.' Mem. Supp. at 9.) Beginning in the 1970s, Mr. Smith began cutting logs for people using a sawmill on his property and selling lumber from his property. (Smith Dep., Ex. 25 to Defs.' Mem. Supp. at 13.) In around 1978, he purchased cows, and he has maintained at least two cows on the property since, which he consumes and sells for meat. (*Id.* at 17–18.) He also keeps at least one hundred chickens on the property; he sells their eggs, and he sells some of the chickens for meat. (*Id.* at 19–21.) He keeps between one and three horses for recreational purposes and about half a dozen goats for milk (which he consumes himself). (*Id.* at 21–22.) In the spring, he buys piglets, raises them

until the fall, and then keeps some to consume himself and sells some for others' consumption. (*Id.* at 23–24.)

Since 1974, Mr. Smith has also operated an excavating business from his property. (*Id.* at 25.) As he excavates, he removes topsoil, and he then brings that topsoil to his property, where he stores it for reuse. (*Id.* at 31–34.) Prior to about 2007 or 2009, he sold topsoil, but he has since largely stopped because too many people are doing it. (*Id.* at 37.) He admitted, though, that he does sell topsoil from time to time. (*Id.* at 73; *see also* Haase Aff., Beard Compl. Ltr. at 9 (testifying that Mr. Smith sold him topsoil in 2012).)

Mr. Smith stores the following equipment on his property: six excavators, two farm trucks, one dump truck, two screeners, and five loaders. (Smith Dep. at 60–61.) He has never operated a trucking or hauling business, scrap metal business, or demolition business from the property. (*Id.* at 72–73.)

In 2008, one of Mr. Smith's neighbors, Debbie Dragonetti, began to complain regularly about his activities on his property. (*Id.* at 50.) Mr. Smith testified that following these complaints, Mr. Brandt visited his property and determined that his use of the property was a prior nonconforming use and was not illegal. (*Id.* at 71.) Mr. Smith is not aware of any complaints filed since that time. (*Id.* at 50.) Mr. Chapman testified that after he received Mr. Beard's complaint letter, he initiated an investigation into the Smith property, during the course of which he discovered two letters by Mr. Brandt about the Smith property. (Chapman Dep. at 53–54, 69.)

In the first, dated May 1, 2008, Mr. Brandt wrote to Mr. Smith that his "records show [that Mr. Smith] ha[d] been operating a business (some type of excavating business) since at least 1979" and that he was "calling that type of business Pre-existing-Non-

Conforming." (May 1, 2008 Brandt Ltr., Ex. 27 to Defs.' Mem. Supp.) He added: "I am not challenging the business, but if there is something else that does not belong on the property, I will ask for your cooperation in removing or improving the situation as it currently exists." (*Id.*) The second letter, dated May 12, 2008, was written after Mr. Brandt visited Mr. Smith's property on May 7, 2008. (May 12, 2008 Brandt Ltr., Ex. 28 to Defs.' Mem. Supp.) In it, Mr. Brandt notified Mr. Smith that everything he saw on the property "was used for farming or the excavating business" and so he was "closing [his] research on th[e] complaint and . . . calling [the] business a pre-existing non-conforming use." (*Id.*)

Mr. Chapman testified that after reviewing these letters, "[a]s far as [he] could see, th[e] case was closed." (Chapman Dep. at 55.) It is not clear whether Mr. Chapman additionally spoke to Mr. Smith about his use of his property. Mr. Chapman first testified that he did not contact Mr. Smith about the sale of his topsoil. (Chapman Dep., Ex. G to Pl.'s Opp'n at 56.) But, a moment later, he stated that after he received Mr. Beard's complaint letter, he asked Mr. Smith to come to his office, and Mr. Smith did so. (*Id.* at 60, Ex. 9 to Defs.' Mem. Supp.) During that conversation, Mr. Chapman asked Mr. Smith about his activities on the property and how he operated his business. (*Id.*) Mr. Smith "maintained that Jack Brandt had already been out there and determined this was legal nonconforming." (*Id.*) Mr. Chapman then "made the determination that" Mr. Smith's use of the property "was all covered by Mr. Brandt's letter" and no further investigation was necessary. (*Id.* at 62.) Mr. Smith, for his part, testified that he had never had a meeting with Mr. Chapman about his property. (Smith Dep. at 64.)

II.     **Discussion**[5]

A.  **Whether the Claim is Ripe**

As a preliminary matter, Defendants assert that the Court lacks subject matter jurisdiction over Plaintiff's claim because Plaintiff failed to exhaust his state administrative remedies. (Defs.' Mem. Supp. at 37–38.)

"Because ripeness is a jurisdictional inquiry, landowners bringing zoning challenges must meet the high burden of proving that [a federal court] can look to a final, definitive position from a local authority to assess precisely how they can use their property before this Court may entertain their claims." *Sunrise Detox V, LLC v. City of White Plains*, 769 F.3d 118, 121 (2d Cir. 2014) (internal quotation marks and brackets omitted). The Supreme Court, in *Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City*, 473 U.S. 172 (1985), "articulated specific ripeness requirements applicable to land use disputes." *Sunrise Detox V*, 769 F.3d at 122 (internal quotation marks omitted). "The Court stated that to meet the ripeness requirement, a

_____

[5] Summary judgment is appropriate where, "resolv[ing] all ambiguities and draw[ing] all permissible factual inferences in favor of the party against whom summary judgment is sought," *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008), "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a).  "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (quotation marks omitted). "The substantive law governing the case will identify those facts that are material, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Bouboulis v. Transp. Workers Union of Am.*, 442 F.3d 55, 59 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). When considering a motion for summary judgment, the Court may consider depositions, documents, affidavits, interrogatory answers, and other exhibits in the record. Fed. R. Civ. P. 56(c).

plaintiff alleging a Fifth Amendment taking of a property interest must satisfy a two-prong test and show that (1) the state regulatory entity has rendered a 'final decision' on the matter, and (2) the plaintiff has sought just compensation by means of an available state procedure." *Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 88 (2d Cir. 2002) (citing *Williamson County*, 473 U.S. at 186, 194–95).

Applying this test, the Supreme Court in *Williamson County* concluded that the claim was not ripe because the plaintiff had failed to seek a variance from the zoning ordinance upon which the zoning commission had relied in rejecting his development plan. 473 U.S. at 188, 191. Because he had not sought a variance, the Court held, the plaintiff had not received a "final, definitive" decision about how the commission would "apply the regulations at issue to the particular land in question." *Id.* at 191. "Although *Williamson County* involved a challenge to a regulatory taking," *Sunrise Detox V*, 769 F.3d at 122 (internal quotation marks omitted), the Second Circuit has extended the *Williamson County* test to equal protection claims asserted in the context of land use challenges, *see Dougherty*, 282 F.3d at 89.

Where, as here, a plaintiff bringing an equal protection challenge contends that her use of her property constituted a prior nonconforming use, it is not necessary for her to seek a variance. *See Gavlak v. Town of Somers*, 267 F. Supp. 2d 214, 221–22 (D. Conn. 2003) (holding that a zoning board's determination that the plaintiffs' use of their property was not prior nonconforming sufficed to meet the *Williamson County* requirements). Rather, her claim is ripe if she demonstrates that she sought review of the Zoning Commission's determination that her use was not a prior nonconforming use. *See id.*; *cf. Lawson v. E. Hampton Planning & Zoning Com'n*, No. 07cv1270 (AHN), 2008 WL

11

4371297, at *5 (D. Conn. Sept. 28, 2008) ("[I]n the absence of a final decision by the [Planning & Zoning Commission] of whether Lawson's predecessor-in-title's earth material operation on the property constituted a preexisting nonconforming use that Lawson was entitled to continue, Lawson's § 1983 claim based on the P & Z's denial of his special permit application to operate an earth material operation on his property is not a final decision that is ripe for review in this court under the first prong of *Williamson*."). Here, Plaintiff has shown that he appealed Mr. Chapman's cease and desist order to the ZBA, partly on the grounds that his "activities on his property constitute pre-existing non-conforming uses." (ZBA Appeal at 7.) The ZBA, the final decision-making body on land use issues in Monroe, denied Plaintiff's appeal in its entirety (albeit without explanation). (ZBA Decision.)

Defendants, relying on Judge Haight's decision in *Ferris v. Town of Guilford*, No. 3:10-cv-2014 (CSH), 2015 WL 128029 (D. Conn. Jan. 8, 2015), contend that Plaintiff's claim is nonetheless unripe because Plaintiff never obtained a final judgment from the state superior court on his appeal of the ZBA's decision.

This argument is unpersuasive for two reasons. First, this Court does not read *Williamson County* as requiring property owners to present available, non-constitutional challenges to a state court before filing in federal court. Second, even if *Williamson County* did require a plaintiff to go to state court, Plaintiff here did, in fact, appeal the ZBA decision to state court, and unlike the plaintiff in *Ferris*, he did not withdraw that appeal. Defendants argue that Plaintiff never received a final judgment on his appeal on the basis of the state court docket sheet. But, that docket sheet reveals that a final judgment in the case, which consolidated the Bauers' nuisance claims with the Town's

12

zoning enforcement action and Mr. Beard's ZBA appeal, was entered on April 18, 2012. (*See* State Ct. Docket, Ex. 18 to Defs.' Mem. Supp.) That the final judgment took the form of granting the Bauers' permanent injunction request and did not specifically mention the Town's enforcement action or Mr. Beard's appeal is not dispositive. (*See* State Ct. Judgment.) It is clear from the docket sheet and the judgment that the court intended its order to resolve all of the claims in the suit. Plaintiff's claim is therefore ripe, and the Court has subject matter jurisdiction over it.

### B.  Class-of-One Claim[6]

The Court now turns to the substance of Mr. Beard's claim. Plaintiff asserts a class-of-one equal protection claim, in which he argues that Defendants violated his Fourteenth Amendment right to equal protection under the law by prohibiting him from manufacturing loam on his property while permitting others to engage in the same activity on their properties. (*See* Pl.'s Opp'n at 1–5.) "While the Equal Protection Clause is most commonly used to bring claims alleging discrimination based on membership in a

---

[6] At oral argument, Plaintiff insisted that he is pursuing both a class-of-one theory and a selective enforcement theory, although his briefing addressed only class-of-one caselaw. To prevail on a selective enforcement claim, however, a plaintiff must prove that she was "selectively treated," "compared with others similarly situated," and "that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Brown v. City of Syracuse*, 673 F.3d 141, 151–52 (2d Cir. 2012). Plaintiff makes no argument and presents no evidence that he was selectively treated "based on impermissible considerations . . . or [a] malicious or bad faith intent to injure" him. Even if Plaintiff had demonstrated this, however, his selective enforcement claim would fail for failure to demonstrate selective treatment compared with others similarly situated and for failure to demonstrate proximate cause, as explained *infra* with respect to his class-of-one claim.

protected class, where, as here, the plaintiff does not allege membership in such a class, he or she can still prevail in what is known as a 'class of one' equal protection claim." *Neilson v. D'Angelis*, 409 F.3d 100, 104 (2d Cir. 2005).

"A class-of-one claim exists 'where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.'" *Analytical Diagnostic Labs, Inc. v. Kusel*, 626 F.3d 135, 140 (2d Cir. 2010) (quoting *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000)). To succeed on a class-of-one claim, a plaintiff must establish that:

> (i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and
> (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendants acted on the basis of a mistake.

*Id.* (quoting *Neilson*, 409 F.3d at 104).[7]

"[T]he level of similarity between the plaintiffs and the persons with whom they compare themselves must be extremely high," *Neilson*, 409 F.3d at 104; *see Ruston v.*

---

[7] The Supreme Court has held that government employees may not bring class-of-one claims against the government, and in so holding, the Court indicated that class-of-one claims may also be unavailable to challenge other discretionary decisions of state actors. *See Engquist v. Oregon Dep't of Agriculture*, 553 U.S. 591, 603 (2008). The Second Circuit has cabined *Engquist*'s reach, however, holding that "*Engquist* does not bar all class-of-one claims involving discretionary state action." *Analytical Diagnostic Labs*, 626 F.3d at 142. The court noted specifically the distinction the *Engquist* Court drew between "'the government exercising the power to regulate or license, as lawmaker, and the government acting as proprietor, to manage its internal operations:'" the "'government has significantly greater leeway in its dealings with citizen employees than it does when it brings its sovereign power to bear on citizens at large.'" *Id.* (quoting *Engquist*, 553 U.S. at 598).

*Town Bd. for Town of Skaneateles*, 610 F.3d 55, 59 (2d Cir. 2010), particularly "'in the land-use context because zoning decisions will often, perhaps almost always, treat one landowner differently from another,'" *Mattison v. Black Point Beach Club Assoc.*, 376 F. App'x 92, 94 (2d Cir. 2010) (quoting *Cordi-Allen v. Conlon*, 494 F.3d 245, 251 (1st Cir. 2007)); *Musco Propane, LLP v. Town of Wolcott*, 891 F. Supp. 2d 261, 272 (D. Conn. 2012) (quoting *Cordi-Allen*, 494 F.3d at 251). "This showing is more stringent than that used at the summary judgment stage in the employment discrimination context." *Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 (2d Cir. 2006). "This is because the existence of persons in similar circumstances who received more favorable treatment than the plaintiff in a class-of-one case is offered to provide an inference that the plaintiff was intentionally singled out for reasons that so lack any reasonable nexus with a legitimate governmental policy that an improper purpose—whether personal or otherwise—is all but certain." *Id.* (internal quotation marks omitted). Although "[g]enerally, whether parties are similarly situated is a fact-intensive inquiry," "[a] court may grant summary judgment in a defendant's favor on the basis of lack of similarity of situation . . . where no reasonable jury could find that the persons to whom the plaintiff compares itself are similarly situated." *Id.*

At oral argument, Plaintiff conceded that Mr. Sippin is not an appropriate comparator. Therefore, the Court will focus its analysis solely on Mr. Twombly and Mr. Smith, who Plaintiff contends are similarly situated because they all manufactured and sold loam on their properties.

### 1.  Mr. Twombly

As an initial matter, the record does not clearly establish that Mr. Twombly sells loam from his property. Mr. Twombly testified that he sells compost and mulch, not loam, and that he acquired a permit to do so.[8] (Twombly Dep. at 8–9.) But, even if he does sell loam, as Plaintiff claims, he is not similarly situated to Mr. Beard in several other material respects.

First, selling loam is not the only illegal activity Mr. Beard was engaged in. Flouting the Town's prohibition on storing commercial vehicles over one ton in capacity on property in RD Zones, Mr. Beard admitted to keeping eight such vehicles on his property. (Beard Test. at 21–23, 29.) Furthermore, although his property was zoned for residential and farming uses, Mr. Beard utilized it for an excavation business, a trucking and hauling business, a salvage business, a demolition business, and a snow plowing business, none of which could reasonably be considered farming activities. Mr. Twombly,

---

[8] Plaintiff argues in his Sur-Reply that "[t]he defendants did not know that Twombly had a state license until January of this year when the plaintiff took Twombly's deposition and he mentioned his state license." (Sur-Reply [Doc. # 61] at 6.) This argument is, however, unsupported by any evidence. Plaintiff also claims in his Sur-Reply that he too holds a state composting permit, and he attached evidence of that permit. However, Plaintiff cannot adduce new evidence in his Sur-Reply. Though Plaintiff claims it is appropriate to introduce evidence at this late juncture because Defendants argued that Mr. Beard does not have a license for the first time in Reply, this is simply not true. In Defendants' memorandum in support of their motion for summary judgment they argued: "There is no evidence that the Plaintiff ever obtained (or tried to obtain) a permit from the State or even the Town to produce and sell farm loam, compost, or any other materials from the Property." (Defs.' Mem. Supp. at 17.) Plaintiff had an opportunity to dispute that claim in his Opposition; he did not do so, and it is too late to do so now. Even if the Court did consider the new evidence submitted by Plaintiff, however, for the reasons given below, it would not alter the conclusion that Plaintiff has not shown that a reasonable jury could find that he was similarly situated to Mr. Twombly.

by contrast, primarily uses his farm to grow trees, and he has never operated an excavation business, trucking or hauling business, snowplowing business, scrap metal salvage business, or demolition business on it. (Twombly Dep. at 8, 59.)

Second, while the record contains no evidence that any of Mr. Twombly's neighbors ever complained about his uses of his property, there is clear and undisputed evidence that Mr. Beard's neighbors complained vociferously and repeatedly about his uses of his property. Indeed, their complaints about Mr. Beard date from March 2010 and continued until well after they had filed a lawsuit against him and Defendants had intervened in that suit. (*See* Ex. 30 to Reply.)

This is not insignificant. As other courts have observed, given the limited resources available to municipalities for enforcement of zoning regulations,[9] deciding to enforce regulations against one individual and not against another because neighbors complained about one and not the other is a legitimate reason for treating two individuals differently.[10] *See Musco Propane, LLP*, 891 F. Supp. 2d at 273 (holding that comparator

---

[9] Plaintiff contends that because Defendants "never claimed they lacked resources to investigate and enforce the regulations against Smith and Twombly," and in fact they did conduct an investigation, any claim now that they have limited resources must be pretextual. (Sur-Reply at 3.) This argument is nonsensical. First, the fact that Defendants did not previously argue that they lacked resources does not prove that they did not lack resources. Second, that Mr. Chapman conducted an investigation into Mr. Beard's claims (involving talking to a few individuals) does not mean that Defendants had the resources to take every violator of the smallest zoning regulation to court.

[10] Plaintiff asserts in his Sur-Reply that "the viability of an equal protection claim has never depended upon the respective volume or number of neighborhood opposition voices." (Sur-Reply at 3.) In support of this argument, Plaintiff cites *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 448 (1985), in which a home for the mentally disabled sued a city, alleging that the city's zoning ordinance requiring mental institutions

was not similarly situated in part because the plaintiff faced community opposition to its proposed use of land while the comparator did not); *Dutko v. Lofthouse*, 549 F. Supp. 2d 187, 192 (D. Conn. 2008) (finding that "loud opposition" from neighbors of the plaintiff but not from neighbors of comparator was legitimate reason to treat the two differently); *Lexjac, LLC v. Inc. Village of Muttontown*, No. 07-cv-4614 (JS), 2011 WL 1059122, at *8 (E.D.N.Y. Mar. 18, 2011) (noting that community complaints regarding one property but not others could be legitimate basis for treating the properties differently); *cf. Gray v. Town of Easton*, No. 3:12cv166 (JAM), 2015 U.S. Dist. LEXIS 94158, at *9 (D. Conn. Jul. 20, 2015) ("Small town governments often make decisions with less than perfect information and ordinarily without the benefit of sophisticated enforcement

---

to obtain a special permit, was unconstitutional. In holding that the ordinance violated the Equal Protection Clause, the Supreme Court observed:

> First, the Council was concerned with the negative attitude of the majority of property owners located within 200 feet of the Featherston facility, as well as with the fears of elderly residents of the neighborhood. But mere negative attitudes, or fear, unsubstantiated by factors which are properly cognizable in a zoning proceeding, are not permissible bases for treating a home for the mentally retarded differently from apartment houses, multiple dwellings, and the like. It is plain that the electorate as a whole, whether by referendum or otherwise, could not order city action violative of the Equal Protection Clause and the City may not avoid the strictures of that Clause by deferring to the wishes or objections of some fraction of the body politic. Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect.

*Id.* (internal quotation marks and citations omitted). *City of Cleburne* is, however, inapposite to the case at bar. Defendants here did not discriminate against Mr. Beard because of community bias against him. They did no more than enforce the zoning laws. While community opposition may not be the basis for a discriminatory zoning decision, as the cited caselaw makes clear, it may be one factor in zoning officials' decision regarding who to pursue for violations of zoning regulations.

18

resources. . . . [In determining whether comparators are similarly situated] [e]nforcement context, sequence, and timing . . . matter."). That is particularly so where, as here, the complaining neighbors had already obtained a temporary injunction against the property owner by the time the town took enforcement action against him. *Cf. Lexjac*, LLC, 2011 WL 1059122, at *8 ("[I]t could well be the case that the Village took an unprecedented action because of unprecedented circumstances, not because of untoward discrimination."). For all of these reasons, Mr. Twombly is not an appropriate comparator, and Defendants' decision not to enjoin him from manufacturing and producing loam on his property does not violate the Equal Protection Clause.

### 2. Mr. Smith

Mr. Smith is undoubtedly a closer call. As Plaintiff notes, both he and Mr. Smith operated businesses that Mr. Brandt had determined to be pre-existing non-conforming uses. Further, Mr. Smith admits to running an excavating business on his property. However, unlike Plaintiff, Mr. Smith averred that he does not manufacture topsoil or loam on his property and that although he sold topsoil prior to about 2007 or 2009, he has largely stopped doing so. (Smith Dep. at 37, 73.)

Moreover, although Mr. Smith has engaged in some nonconforming activities on his property, unlike Mr. Beard, he appears to use his property primarily for farming—the use for which the land is zoned. He testified that he has cows on his property, which he consumes and sells for meat; he keeps at least one hundred chicken on the property for eggs and meat; he has several horses for recreational purposes; he keeps about six goats for milk; and he raises pigs for consumption by himself and others. (*Id.* at 17–24.) Mr. Beard, by contrast, testified that he has two horses on the property, and although his

19

family used to have cows, pigs, and other animals on the property, he no longer does. (Beard Test. at 31–32.) When asked what he farms now, he replied "loam." (*Id.* at 32.)

Although there is evidence that Mr. Smith's neighbor, Debbie Dragonetti, complained about his use of his property in 2008, and perhaps again in 2012 (Smith Dep. at 50), there is no evidence that the quantity, volume, and intensity of those complaints came close to that of the Bauers' complaints.

Finally, and importantly, Plaintiff has not come forward with any evidence from which a reasonable jury could infer that the similarity between his pre-existing uses of his property and those of Mr. Smith was so great that Mr. Chapman's decision to defer to Mr. Brandt's determination with regard to Mr. Smith but not as to Plaintiff could not have been the result of a mistake or a legitimate governmental policy. Indeed, the only evidence in the record regarding pre-existing uses of Plaintiff's property as compared to Mr. Smith's property are: a statement by Plaintiff in an undated memorandum purportedly written by Jack Brandt that a loam business has been on the farm since 1963 (Brandt Mem.); a statement by Plaintiff that his father did "essentially" the "same thing" with the property as Plaintiff except that his father did not engage in salvage work (Beard Test., Ex. C to Pls.' Opp'n at 8); and a statement by Mr. Brandt that Mr. Smith had been operating "some type of excavating business" on his property since 1979 (May 1, 2007 Brandt Ltr.). No reasonable jury could conclude, on the basis of this evidence, that it is "all but certain" that Defendants refused to grant Plaintiff pre-existing use status for "an improper purpose—whether personal or otherwise." *Clubside*, 468 F.3d at 159.

As Judge Meyer recently explained in *Gray*,

> not every wrong or ill-informed decision by a local government official is grounds for a federal constitutional cause of action. Nor is a nefarious purpose to be presumed from a town's incomplete enforcement of the law, because "equal protection does not require that all evils of the same genus be eradicated or none at all," and "[m]ere failure to prosecute other offenders is not a basis for a finding of denial of equal protection."

2015 U.S. Dist. LEXIS 94158, at *10 (quoting *LeClair v. Saunders*, 627 F.2d 606, 608 (2d Cir. 1980)). But, even if a reasonable jury could infer, on the basis of Defendants' treatment of Mr. Smith that Mr. Beard "was intentionally singled out for reasons that . . . lack any reasonable nexus with a legitimate governmental policy," *Clubside*, 468 F.3d at 159, Defendants are entitled to summary judgment because no reasonable jury could find the Plaintiff was proximately harmed by Defendants' actions.

### C. Proximate Cause

"[I]n all § 1983 cases, the plaintiff must prove that the defendant's action was a proximate cause of the plaintiff's injury." *Gierlinger v. Gleason*, 160 F.3d 858, 872 (2d Cir. 1998); *see Rahman v. Fisher*, 607 F. Supp. 2d 580, 584 (S.D.N.Y. 2009) ("A defendant's conduct must be a proximate cause of the claimed violation in order to find that the defendant deprived the plaintiff of his rights." (citing *Martinez v. California*, 444 U.S. 277, 285 (1980)). "Proximate cause analysis under Section 1983 incorporates common-law tort causation principles." *Rahman*, 607 F. Supp. 2d at 584 (citing *Higazy v. Templeton*, 505 F.3d 161, 175 (2d Cir. 2007)); *see also Monroe v. Pape*, 365 U.S. 167, 187 (1961) (Section 1983 "should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions").

21

"To establish causation . . . , a plaintiff generally must show that the defendant's conduct was a 'substantial factor in bringing about the harm.'" *Tufariello v. Long Island R. Co.*, 458 F.3d 80, 87 (2d Cir. 2006) (quoting Restatement 2d of Torts § 431(a)). "'Evidence which presents no more than a choice of probabilities is not deemed substantial enough to warrant submission of a case to the jury. Liability cannot be predicated upon mere conjecture or speculation as to the proximate cause of damage.'" *Armstrong v. Commerce Tankers Corp.*, 311 F. Supp. 1236, 1240 (S.D.N.Y. 1969) *aff'd*, 423 F.2d 957 (2d Cir. 1970) (quoting *Dayton Veneer & Lumber Mills v. Cincinnati, N.O. & T.P. Ry. Co.*, 132 F.2d 222, 223 (6th Cir. 1942)); *see also* Restatement 2d of Torts § 433B(1) cmt. a ("[A plaintiff] must make it appear that it is more likely than not that the conduct of the defendant was a substantial factor in bringing about the harm. A mere possibility of such causation is not enough; and when the matter remains one of pure speculation and conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant."). "The term 'proximate cause' is," in other words, "shorthand for a concept: Injuries have countless causes, and not all should give rise to legal liability. . . . Because of convenience, of public policy, of a rough sense of justice, the law arbitrarily declines to trace a series of events beyond a certain point." *CSX Transp., Inc. v. McBride*, 131 S. Ct. 2630, 2637 (2011) (internal quotation marks, alterations, and citations omitted).

Here, Plaintiff claims that he suffered damages in the form of "stomach problems, sleepless nights, bloating, heartburn, stress, neck pain, everything," which "started when the [Bauers'] lawsuit started" in June 2010. (Beard Dep. at 132–33.) As Defendants note, however, Mr. Chapman did not issue the cease and desist order until May 2011, and

Defendants did not intervene in the lawsuit until June 2011. Plaintiff conceded at oral argument that the record contains no evidence that his physical symptoms were exacerbated or that he suffered new injuries due to Defendants' involvement. Instead, Plaintiff asserts that for various reasons, the outcome of the Bauers' lawsuit was altered by Defendants' intervention in it, and that therefore, a jury could find proximate cause.

Preliminarily, if the only injury Plaintiff claims *preceded* Defendants' involvement in the state case, and Plaintiff makes no claim that this injury was exacerbated or a new injury was caused by entry of judgment against him in the case, Plaintiff has patently failed to demonstrate that Defendants' actions caused him harm. However, even assuming that Plaintiff did suffer some physical or financial harm as a result of the judgment in the state court action, he has not shown that Defendants were "a substantial factor in bringing about" that harm. *Tufariello*, 458 F.3d at 87 (internal quotation marks omitted).

Plaintiff asserts that Defendants' intervention in the state case altered the outcome of the suit in several ways: (1) "by placing the town's vast legal resources essentially at the disposal of the Bauers for free" and thus "removing any incentive for them to settle the case" (Pl.'s Opp'n at 23); (2) by moving to exclude evidence of other loam operations in the town (Sur-Reply at 9); (3) by eliminating the requirement that the Bauers demonstrate irreparable harm (*id.* at 10); and (4) by requiring the judge to defer to the ZEO's interpretation of the zoning regulations (*id.*).

### 1. Likelihood of Settlement

Plaintiff's first argument, that the Bauers probably would have settled with him had Defendants not intervened, is wholly speculative. As Defendants note, the Bauers had

already obtained a preliminary injunction by the time the Town and Mr. Chapman intervened in the suit. There is simply no evidence from which a reasonable trier of fact could conclude that Defendants' intervention in the suit, at a time when the Bauers were already prevailing, caused them not to settle with Mr. Beard.

This is particularly so given the evidence in the record regarding the strength of the Bauers' objections to Mr. Beard's activities on his property and their demonstrated commitment to stopping those activities. Defendants produced a series of letters and emails by the Bauers to Mr. Brandt, Mr. Chapman, Town Selectman Stephen Vavrek, Zoning Commission Chairman Richard Zini, Town Planner Dan Tuba, Town Engineer Scott Schatzlein, and Town Attorneys Ed McCreary and John Fracassini, dating from March 29, 2010 (shortly before the Bauers filed the lawsuit) to September 2012 (five months after the final injunction was issued). (*See* Ex. 30 to Reply.) The letters detail daily accounts of alleged violations of the zoning regulations, court order, and cease and desist order, and include references to videotapes and photographs that the Bauers had created to demonstrate Mr. Beard's allegedly illegal activities on his property. (*Id.*) No reasonable person could look at these letters and conclude that the Bauers likely would have settled the lawsuit with Mr. Beard had Defendants not intervened.

Importantly, Plaintiff has offered no facts from which it can reasonably be inferred that the Bauers would even have agreed, in a settlement, to permit Mr. Beard to continue to produce and sell loam from his property.

### 2.  Motion in Limine

Plaintiff next argues that had Defendants not moved to exclude evidence of zoning violations of others in the town, the outcome of the suit would have been

different. There are several problems with this claim. First, Plaintiff's assertion that had Defendants not moved to exclude this evidence, the Bauers would not have so moved is pure conjecture, unsupported by any evidence. The court granted Defendants' motion on the grounds that though the evidence might have been relevant to a § 1983 suit, it was not relevant to a nuisance suit. There is nothing about that argument that was specific to Defendants, such that the Bauers could not have argued the same.[11] Second, even if the Bauers had not moved to exclude the evidence, it is hard to imagine why evidence that was clearly not relevant to the suit before the court would have influenced the outcome of that suit.

### 3. Burden of Proof

Plaintiff additionally contends that because Connecticut law does not require municipalities to demonstrate irreparable harm in order to obtain a permanent injunction, but it does require such a showing from individuals, Defendants' intervention "forever changed" the "character" of the lawsuit. (Sur-Reply at 10.) While this may be Plaintiff's strongest argument in support of proximate cause, it is still not sufficient to permit a reasonable jury to find proximate cause. Because the superior court had already found irreparable harm when it granted the temporary injunction (before the Town and Mr. Chapman intervened in the suit), Plaintiff offers no basis to conclude the court would likely have later reversed itself if the Town and Mr. Chapman had not intervened.

---

[11] Plaintiff's contention that the Bauers could not have made such an argument "since they are not state actors under § 1983" is perplexing. (Sur-Reply at 9.)

### 4.   Deference to ZEO

Plaintiff's final argument in support of finding proximate cause, upon which he relied at oral argument, is that "as [a] consequence [of] the intervention of the town, the Bauers['] suit was bolstered by the new ZEO's interpretation of the regulations, which Judge Tyma was then required to defer to." (*Id.* at 9.) This claim is unpersuasive for at least three reasons.

First, as stated by the Supreme Court of Connecticut in *Wood v. Zoning Bd. of Appeals of Town of Somers* (cited by Plaintiff as support for his argument), while "[a]n agency's factual and discretionary determinations are to be accorded considerable weight" by reviewing courts, where a case presents a pure question of law and the "agency's determination . . . has not previously been subject to judicial scrutiny . . . the agency is not entitled to special deference." 258 Conn. 691, 698 (2001) (internal quotation marks omitted); *see also Graff v. Zoning Bd. of Appeals of Town of Killingworth*, 277 Conn. 645, 652 (2006). The issue in *Wood*, which the court found to be a "question of law," was whether the plaintiff's use of his property "for the collection, storage and transportation of spring water" was a permitted "agricultural use" under the town's zoning regulations. 258 Conn. at 696–97, 699. Although Judge Tyma's final judgment does not explain the basis of his final decision, his memorandum of decision on the temporary injunction indicates that the focus of both the parties' arguments and his decision was the meaning of the term "farming" in the Monroe regulations and whether "farming" encompasses the manufacture and sale of loam. (*See* Temp. Inj. at 7–8.) This question, like the question presented in *Wood* regarding whether the collection, storage and transportation of spring

water constituted "agriculture," is a question of law, for which the court would not have been required to defer to the ZEO's interpretation.

Second, and relatedly, Judge Tyma had determined, before Defendants intervened in the lawsuit, that loam farming was not a "farming" activity within the meaning of the Monroe zoning regulations. Whether or not Mr. Chapman's interpretations would have been entitled to deference after he intervened in the suit, it is not apparent that such deference would have made any difference in the court's determination. Finally, Plaintiff has cited no authority for the proposition that an administrative agency's interpretation of a zoning regulation is not entitled to deference unless the agency is a party to the lawsuit.

In light of the absence of evidence that Defendants' intervention in the Bauer lawsuit was a substantial cause of Mr. Beard's alleged damages, no reasonable jury could conclude that Mr. Beard has demonstrated proximate cause, and summary judgment is thus granted in Defendants' favor.

### III.    Conclusion

For the foregoing reasons, Defendants' Motion [Doc. # 49] for Summary Judgment is GRANTED. The Clerk is requested to close this case.


IT IS SO ORDERED.

_____/s/_____
Janet Bond Arterton, U.S.D.J.


Dated at New Haven, Connecticut this 4th day of December, 2015.

27